## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MITCHEL A.,** [1] | ) |
| | )    **No. 19 CV 1757** |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Magistrate Judge Young B. Kim** |
| | ) |
| **ANDREW M. SAUL, Commissioner of** | ) |
| **Social Security,** | ) |
| | )    **May 11, 2020** |
| **Defendant.** | ) |

### MEMORANDUM OPINION and ORDER

Mitchel A. seeks childhood disability benefits ("CDB"), disability insurance benefits ("DIB"), and supplemental security income ("SSI") based on his claim that he is disabled by traumatic brain injury ("TBI"), multiple sclerosis ("MS"), confusion, blurred vision, and fatigue. Before the court are the parties' cross motions for summary judgment. For the following reasons, Mitchel's motion is denied, and the government's is granted:

### Procedural History

Mitchel filed his CDB, DIB, and SSI applications in September 2015 alleging in all three applications a disability onset date of June 13, 2015. (Administrative Record ("A.R.") 13.) After his applications were denied initially and upon reconsideration, (id. at 157-71, 178-89), Mitchel requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 190-91, 214-42, 244-49).

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only Plaintiff's first name and last initial in this opinion to protect his privacy to the extent possible.

Mitchel appeared for the hearing on August 9, 2017, along with his attorney, his mother, and a vocational expert ("VE"). (Id. at 39-86.) The ALJ issued a decision in November 2017 finding that Mitchel is not disabled. (Id. at 13-29.) When the Appeals Council declined Mitchel's request for review, the ALJ's decision became the final decision of the Commissioner. *See Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Mitchel filed this lawsuit seeking judicial review of the Commissioner's decision, (R. 1), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 8).

## Facts

Mitchel was a week shy of his 22nd birthday at the time of his alleged disability onset date of June 13, 2015.[2] (A.R. 15.) He had completed high school and two years of college and had worked as a cashier and a butcher at a grocery store. (Id. at 16, 27.) Mitchel last worked in June 2015. He said he left his job because he cut his hand at work. (Id. at 42.) He asserts that he was experiencing extreme fatigue, excruciating leg pain, a lot of numbness and tingling, and loss of feeling in his hands, arms, and legs. (Id. at 55.)

### A.    Medical Evidence

The medical records show that in 2010 and 2011 Mitchel received treatment for symptoms stemming from a concussion he sustained playing football in 2008. (See generally A.R. 515-75.) In September 2010 he presented at Marianjoy Rehabilitation Hospital with complaints of dizziness, headaches, blurred vision, and

---

[2] To qualify for CDB, Mitchel must prove that his disability began before he turned 22 years of age. *See* 20 C.F.R. §§ 404.102, 404.350(a)(5).

weakness. (Id. at 567.) At that time, his brain MRI and CT scans were unremarkable. (Id. at 554, 578, 580-82.) In October 2010 a neurologist diagnosed Mitchel with dementia pugilistica,[3] (id. at 477), a form of TBI, and he started intensive outpatient rehabilitation services at Marianjoy, (id. at 512-13). By February 2011 he reported no headaches or nausea, improved attention and concentration, and decreased fatigue. (Id. at 515.) There are no medical records showing that Mitchel sought or received treatment for his TBI symptoms after he graduated from high school in the spring of 2011.

Mitchel's medical records resume in July 2015 when he was admitted into the hospital for evaluation of right-side body numbness. (Id. at 409.) On examination, he showed "extremely subtle" facial asymmetry and good sensation and normal strength bilaterally. (Id. at 410.) On July 30, 2015, after three days in the hospital, Mitchel was released with a diagnosis of MS. (Id. at 423.) He was started on medication and referred to a neurologist. (Id. at 416-17.)

On August 11, 2015, Mitchel met with Dr. Mircea Iacob, who has since become his treating neurologist. (Id. at 423.) Mitchel reported to Dr. Iacob that his weakness, numbness, and tingling had improved with medication. (Id.) An examination revealed that Mitchel had normal range of motion, normal tone and strength in both extremities, no tremors or dysmetria in coordination, and normal gait. (Id. at 425-46.) During the next two months, Mitchel received chiropractic

---

[3] Dementia pugilistica, also known as punch-drunk syndrome or boxers' dementia, is a form of dementia that originates with cumulative and repetitive head trauma. Its symptoms sometimes develop after a latent period of years. *See* https://www.dementia.org/dementia-pugilistica (last visited April 14, 2020).

and physical therapy approximately three times a week.[4]  (Id. at 439-53.)  By early October 2015 he reported improved lower back pain and decreased fatigue with regular treatment.  (Id. at 446.)

At a follow-up appointment with Dr. Iacob in November 2015, Mitchel reported that his weakness minimally improved after starting another medication, but the numbness in his face, arms, and legs remained unchanged.  (Id. at 427.)  He also reported difficulty sleeping because of back pain, but physical therapy helped with his strength.  (Id.)  The examination again noted normal findings, except Mitchel had slightly decreased motor range in the right leg and decreased sensation in a small area on the thighs.  (Id. at 429.)

In conjunction with his applications for benefits, Mitchel met with Dr. Ravikiran Tamragouri for a physical consultative examination in November 2015.  (Id. at 455-58.)  Mitchel reported fatigue, blurred vision, body pains, and a loss of feeling in his face, hands, and legs.  (Id. at 455.)  The examination showed that Mitchel had normal range of motion except for decreased external rotation of the hips.  (Id. at 456-57.)  He also had full grip strength in both hands and normal gait.  (Id. at 457.)  He walked without support and had full leg and arm strength.  (Id. at 457-58.)  Dr. Tamragouri noted that Mitchel had lost his sense of touch in scattered areas with a reported tingling sensation.  (Id.)

---

[4]  Mitchel also received regular chiropractic and physical therapy from March 2016 through June 2017 for his neck and back pain and numbness and tingling in his extremities.  (A.R. 754-1323.)

In December 2015 consulting physician Dr. Vidya Madala reviewed Mitchel's records and determined that he had no medical evidence to support his childhood disability claim. (Id. at 90.) Regarding his adult disability claims, Dr. Madala concluded that Mitchel can perform light work with occasional limitations in climbing and based on his history of MS should avoid concentrated exposure to vibration and hazards such as machinery and heights. (Id. at 101-02, 111-12.)

Mitchel followed up with Dr. Iacob in February and March 2016. The examination at both appointments revealed that Mitchel had normal range of motion, normal tone and strength in both extremities, normal gait, and slight positional and intentional tremors in coordination but no dysmetria. (Id. at 432-33, 703.) Mitchel had decreased sensation of the left palm at the February appointment, which improved by the March appointment. (Compare id. at 433 with id. at 703.) At the February 2016 appointment Mitchel also complained of worsening fatigue, back pain, bilateral leg pain, and increased headaches. (Id. at 431.) Dr. Iacob changed Mitchel's medication. (Id. at 433, 704.)

Mitchel presented for another physical consultative examination in May 2016, this time with Dr. Mahesha Shah. (Id. at 464.) Mitchel reported that because of his TBI he occasionally suffers from migraine headaches, blurry vision, and fatigue. (Id. at 465.) He also reported that his MS symptoms have improved but he still has some numbness in his hands and feet. (Id.) Regarding his lower back pain, Mitchel stated that he cannot stand or walk for long and cannot lift anything heavy from the floor. (Id.) Dr. Shah observed that Mitchel walked into the office without

any assistive devices and moved without difficulty. (Id.) Dr. Shah also found that Mitchel's back, extremities, and musculoskeletal regions, including his gait, were all normal. (Id. at 466-67.) Mitchel could bear his own weight, squat down, grasp, and engage in fine and gross manipulation. (Id. at 467.) Dr. Shah noted that Mitchel's sensations were diminished in the upper and lower extremities but rated his motor strength for both extremities as five out of five. (Id.)

In July 2016 consulting physician Dr. Charles Kenney reviewed Mitchel's records in connection with his request for reconsideration and concurred with Dr. Madala's assessment for the childhood disability claim. (Id. at 149.) Like Dr. Madala, Dr. Kenney also concluded that Mitchel is capable of light work, but that he could never climb ladders, ropes, or scaffolds and that he should avoid activities requiring sensation with his upper extremities. (Id. at 126-27, 139-40.)

At his six-month follow-up appointment with Dr. Iacob in September 2016, Mitchel reported that he felt tired. (Id. at 707.) An examination revealed that Mitchel had no tremors in coordination and normal examination findings. (Id.) An August 2016 brain MRI showed two new demyelinating lesions on both frontal lobes comparable with a history of MS and improvement of several white matter lesions previously detected on a July 2015 MRI. (Compare id. at 583-84 with id. at 415.) Dr. Iacob suspected obstructive sleep apnea. (Id. at 707-08.)

Mitchel underwent sinus surgery in December 2016, which resolved his complaints of blurry vision. (Id. at 1106; see also id. at 718-31 (outpatient sinus surgery records).) By the end of 2016 Mitchel reported experiencing virtually no

neck pain, less intense lower back pain, improvement in mobility, decreased headaches, and less sleep interruption, though his numbness and tingling generally persisted. (See, e.g., id. at 820, 830, 835, 842, 851, 856, 866, 871, 885, 901, 909, 917, 924, 932, 940, 948, 963, 970, 978, 986, 1009.)

But then Mitchel started reporting constant back pain in early 2017. At a follow-up appointment with Dr. Iacob in February 2017, Mitchel complained that he felt tired and had pain in his low back that radiated down to his posterior thighs. (Id. at 710.) The examination revealed normal findings except for a positive straight leg test. (Id. at 711.) Dr. Iacob made changes to Mitchel's medication and advised him that "[w]eight loss is very important." (Id. at 712-13.) He also ordered an MRI of the lumbar spine, (id. at 712), which showed minimal degenerative changes, (id. at 733). Sleep studies conducted in March and May 2017 confirmed severe sleep apnea and, as a result, Mitchel was advised to use a CPAP machine at night and lose weight. (Id. at 734-41.) Mitchel's medical records show that in March 2017 his weight was as high as 295 pounds, with a BMI of 42.7. (Id. at 735.)

In June 2017 Mitchel went to the emergency room complaining of a new burning feeling in the left side of his body and general left-sided weakness. (Id. at 742.) An examination revealed normal findings, including full motor strength in all extremities and intact sensory to light touch despite reports of burning in the left upper and lower extremities. (Id. at 746.) A brain MRI showed no significant changes from the August 2016 MRI. (Id. at 591-92.) Mitchel was released the same day. (Id. at 747.)

In July 2017 Dr. Iacob completed a medical source statement. (Id. at 1324-26.) Dr. Iacob described Mitchel's subjective symptoms as "pain [in] thighs, fatigue, numbness, and face droop" and noted that Mitchel's overall prognosis is "OK." (Id. at 1324.) Dr. Iacob opined that Mitchel's fatigue from MS interferes with his ability to perform routine daily activities and his social functioning. (Id. at 1324-25.) But he noted that he could not determine if the fatigue interferes with Mitchel's ability to sustain sedentary full-time work. (Id.) He further noted that he could not predict how often Mitchel's impairments and treatment would cause him to be absent from work. (Id. at 1326.)

As for Mitchel's mental health, there are no records from any treating mental health provider. During a December 2015 consultative examination with psychologist Dr. James Gioia, Mitchel stated that he received counseling following his TBI but denied being diagnosed with any type of mental illness. (Id. at 460.) Mitchel stated that his doctors were concerned about his anxiety level. (Id.) An examination showed that Mitchel appeared to be oriented to time, person, and place and that his overall speech and language appeared to be articulate and comprehensible, but his overall mood appeared to be depressed. (Id. at 461.)

Mitchel underwent another consultative examination with psychologist Dr. Michael Ingersoll in May 2016. (Id. at 469.) Mitchel reported to Dr. Ingersoll that his daily schedule included attending doctor appointments, exercising, reading, watching television, and doing household chores like laundry and dishes. (Id. at 470.) Dr. Ingersoll observed that Mitchel's affect and mental state were normal, his

8

sensorium and cognition were clear, and that he exhibited no evidence of confusion. (Id.) He noted that functionally Mitchel appeared to be doing well and was independent and self-sufficient. (Id.) Dr. Ingersoll found that Mitchel's simple focused attention and short-term immediate verbal memory were intact. (Id.)

Consulting psychologists reviewed the record in connection with Mitchel's initial applications for disability benefits and request for reconsideration of the denials. At the initial level Dr. Gayle Williamson determined that Mitchel has no medical evidence to support his childhood disability claim. (Id. at 91.) Regarding his adult disability claims, Dr. Williamson found that Mitchel has a non-severe mental impairment that results in mild restrictions in concentration, persistence, or maintaining pace and no restriction of activities of daily living, no difficulties in social functioning, and no repeated episodes of decompensation of extended duration. (Id. at 99, 109.) At the reconsideration level Dr. Howard Tin agreed with Dr. Williamson's assessment for Mitchel's childhood disability claim, (id. at 150), and opined that, as an adult, Mitchel has a non-severe mental impairment with mild restriction of activities of daily living and no difficulties in concentration, persistence, or pace, (id. at 124, 137).

## B. Hearing Testimony

Mitchel testified that since his TBI he cannot stare at screens for more than an hour because it gives him migraines. (A.R. 43, 63.) He described numbness and tingling and some loss of feeling in his hands, arms, and legs, (id. at 55, 66), and trouble concentrating, (id. at 58, 62). He also said he has extreme lower back pain

and since February 2017 he has been wearing a back brace. (Id. at 51.) His lower back hurts when he sits in the same position for 20 minutes, (id. at 65), and he cannot walk for more than 10 minutes without getting very tired, (id. at 62). He testified that he occasionally uses a cane but did not need it on the day of the hearing. (Id.) As for his mental health, Mitchel said he does not see any counselors or psychiatrists. (Id. at 51.)

Mitchel testified that he currently lives with his girlfriend and her family. (Id. at 44.) As for daily activities he said that he helps around the house by preparing ingredients for dinner or drying dishes. (Id.) He also takes a nap once or twice a day to "recharge." (Id. at 57.) He has a driver's license and drives a few times a week. (Id. at 44-45.) He travels up to three times a week, 45 minutes each way, to see his chiropractor. (Id. at 66-67.) Mitchel uses his cell phone to look up "random information" and post to Facebook a few times a day. (Id. at 46-47.) He testified that the numbness in his hands has caused him to physically drop the phone and that he sends 10 text messages "on a good day." (Id. at 46.) He reads occasionally but has a hard time concentrating. (Id. at 61-62.) He also plays video games once or twice a week for about an hour. (Id. at 48-49.)

Mitchel testified that he and his girlfriend went to a concert in 2016 at Soldier Field in Chicago. (Id. at 51.) He also traveled by plane to Boston in March 2017. (Id. at 50, 54.) He testified that he spent the weekend prior to the hearing hanging out with a friend. (Id. at 49.)

Mitchel's mother testified that Mitchel and his girlfriend travel 78 miles each way to her home almost every weekend to visit and stay for a few days at a time. (Id. at 70, 74.)  She says that fatigue and back pain are Mitchel's primary issues. (Id. at 71.)  During their visits, she sees Mitchel napping intermittently during the day, (id. at 73), and has noticed him dropping things, (id. at 75).  She also testified that she cannot give Mitchel too much information because "if he can't process it he shuts down."  (Id. at 72.)  She testified this also happens when Mitchel is overly tired.  (Id.)

## C.     The ALJ's Decision

The ALJ found that Mitchel met the age requirement for CDB eligibility and met the insured status requirements through December 31, 2019.  (A.R. 14-15.)  At step one, the ALJ found that Mitchel had not engaged in substantial gainful activity since the alleged onset date.  (Id. at 16.)  At step two, the ALJ found that Mitchel suffers from the following severe impairments: morbid obesity, MS, obstructive sleep apnea, and depression.  (Id.)  At step three, the ALJ found that Mitchel's impairments or combination of impairments did not meet or medically equal a listed impairment.  (Id.)  Before reaching step four, the ALJ determined that Mitchel has the residual functional capacity ("RFC") to perform light work, except he can: occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently reach in all directions, including overhead with both upper extremities; handle, finger, and feel with both upper extremities; tolerate occasional exposure to and work around extreme cold and heat,

wetness, humidity, noise, vibration, and fumes and other pulmonary irritants; never work around hazards such as moving machinery or unprotected heights; and perform simple routine tasks requiring no more than short simple instructions and simple work-related decision making with few workplace changes.  (Id. at 19.)  At steps four and five, the ALJ concluded that Mitchel is unable to perform his past relevant work but that there are jobs that exist in significant numbers in the national economy that he can perform.  (Id. at 27-28.)

## Analysis

Mitchel argues that the ALJ erred by: (1) determining that his TBI is not severe at step two; (2) failing to account for his non-exertional limitations, such as his inability to concentrate; (3) incorrectly evaluating his subjective symptoms; and (4) assessing his mental RFC without relying on a specific medical opinion and assigning "minimal weight" to his mother's testimony.  In reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence.  *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  Substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The court is required to affirm an adequately supported decision even if reasonable minds could disagree as to the correct decision on disability.  *See Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015).

## A.    Step-Two Analysis

Mitchel argues that the ALJ erred at step two by failing to include his TBI among his "severe" impairments.  The claimant bears the burden of establishing a severe impairment.  20 C.F.R. § 404.1512; *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work.  20 C.F.R. § 404.1520(c).  An ALJ's failure to account for a severe impairment at step two of the sequential analysis is harmless so long as the ALJ continues to the next step.  *Castile*, 617 F3d at 927.  Thus, if the ALJ finds at least one severe impairment and considers the aggregate effects of all the claimant's limitations in the following steps, whether severe or non-severe, a remand of the case is unnecessary.  *Id.*

Here Mitchel asserts that, in light of his diagnosed dementia pugilistica, the ALJ's finding that his TBI is non-severe is flawed because it "suggests a basic misunderstanding of the progression of the disease."  (R. 14, Pl.'s Mem. at 8.)  "[D]ementia pugilistic[a] is chronic," Mitchel explains, "and its symptoms sometimes remain latent for years."  (Id.)  Mitchel claims that he has already begun to endure recurrent headaches and disequilibrium as a result of his TBI and asserts that his "already disabling symptoms will undoubtedly worsen as time passes."  (Id.)  The government responds that Mitchel fails to show how his dementia pugilistica affects his ability to work because he offers "only potential symptoms" of his condition and the "warning that his condition is progressive and will worsen over time."  (R. 18,

Govt.'s Mem. at 2.)  Regardless, the government argues that the ALJ appropriately considered Mitchel's TBI symptoms in assessing his RFC.  (Id.)

Reviewing the medical records and Mitchel's hearing testimony, the court finds that there is substantial evidence to support the ALJ's finding that Mitchel's TBI is not severe.  *See Burmester*, 920 F.3d at 510.  The record refers generally to Mitchel's history of TBI and his reportedly related symptoms, (see, e.g., A.R. 409 (recurrent headaches and disequilibrium), 427 (weight gain and depression from Ritalin), 439-40 (body pains), 460 (short-term memory loss); see also id. at 608, 755), but lacks any objective evidence that the condition more than minimally limits his ability to work, *see* 20 C.F.R. § 404.1520(c).  Furthermore, Mitchel does not point to any evidence indicating he received treatment for TBI symptoms after 2011.  *See Colson v. Colvin*, 120 F. Supp. 3d 778, 788 (N.D. Ill. 2015) (listing ongoing treatment as a factor courts consider in deciding whether an impairment is severe). While Mitchel asserts that dementia pugilistica is often characterized as a progressive condition, (R. 14, Pl.'s Mem. at 8), the government is correct that this diagnosis alone and its potential impact do not demonstrate that Mitchel is significantly limited in his ability to perform basic work, (R. 18, Govt.'s Mem. at 2 (citing *Collins v. Barnhart*, 114 Fed. Appx. 229, 234 (7th Cir. 2004) ("[T]he existence of these conditions alone does not prove that the conditions so functionally limited [the claimant] as to render [him] completely disabled during the relevant period.")).

The court need not belabor this point because the ALJ found the existence of four severe impairments at step two.  (A.R. 16.)  The critical issue thus is whether

the ALJ properly considered the aggregate effect of Mitchel's severe and non-severe impairments in the remaining steps of the analysis. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). On this point Mitchel's argument is underdeveloped. He claims the ALJ failed to consider the impact of his TBI when making her RFC determination but offers no supporting argument for this supposed error. (R. 14, Pl.'s Mem. at 7.) Underdeveloped, skeletal arguments are not acceptable and are insufficient to show that a remand is warranted. *See Hunt v. Astrue*, No. 10 CV 2874, 2012 WL 1044744, at *8 (N.D. Ill. March 26, 2012) (rejecting underdeveloped arguments that the ALJ should have found a severe impairment at step two). In any event, this argument is without merit. The ALJ expressly noted that the limitations in Mitchel's RFC based on his severe impairments would also accommodate the non-severe impairment identified at step two—that is, the TBI. (A.R. 27.) As a result, she declined to impose any additional limitations. (Id.) Because the ALJ properly considered Mitchel's TBI in subsequent steps of the analysis, the court finds no reversible error at step two.

**B.    Non-Exertional Limitations**

Mitchel next argues that the ALJ's RFC assessment lacks the support of substantial evidence because, according to him, it fails to accommodate non-exertional limitations stemming from his inability to concentrate or remain on task. (R. 14, Pl.'s Mem. at 9.) He first claims that the ALJ improperly assessed only moderate limitations in the area of concentration, persistence, or pace. (Id. at 9.) But then he backtracks, asserting that the error lies in the ALJ's failure to

recognize the impact that his moderate limitations have on his ability to sustain work on a regular and continuing basis.[5]  (Id. at 10.)  Neither argument is persuasive.

Regarding the ALJ's finding that Mitchel has moderate limitations in the area of concentration, persistence, or pace, Mitchel argues that the ALJ improperly rested her determination on Mitchel's ability to play video games for an hour at a time and the fact that he completed two years of college.  (Id. at 9.)  But Mitchel neglects to acknowledge that the ALJ also based her decision on the opinion of examining state agency psychologist Dr. Ingersoll, who in May 2016 found that Mitchel could recall six digits forward and four digits backwards, his simple focused attention and short-term immediate verbal memory were intact, his sensorium and cognition were clear, and there was no evidence of confusion.  (A.R. 26.)  Moreover, the ALJ's finding of moderate limitations is more limiting than the findings of the consulting psychologists who opined that Mitchel has only mild restrictions in concentration, persistence, or pace and later found that he has no difficulties in this functional area.  (See id. (discussing Drs. Williamson's and Tin's opinions).)  The ALJ explained that she gave "some weight" to these psychologists' assessments because they were reasonable and well supported, but that she also considered

_____

[5]  Mitchel claims that the ALJ improperly inferred from her determination that he has only moderate limitations in concentration, persistence, or pace and can perform unskilled work, (R. 14, Pl.'s Mem. at 9), but he did not develop this argument in his opening brief or in his reply, even after the government exposed the argument as perfunctory, (see R. 18, Govt.'s Mem. at 3).  Therefore, he has waived this point.  *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedent that 'skeletal' arguments may be properly treated as waived.").

additional documentation and testimony in making her moderate limitations finding. (Id.) Her explanation is well reasoned.

Mitchel does not challenge the ALJ's decision to give "some weight" to these psychologists' assessments, but he faults the ALJ for noting that Mitchel did not show any difficulty concentrating during the 40-minute hearing. (R. 14, Pl.'s Mem. at 10.) Mitchel seems to suggest that because a hearing is not a "typical setting" the ALJ should not have relied on her own observations of Mitchel's ability to concentrate in making her moderate limitations finding. (Id.) But the Seventh Circuit has stated that ALJs are entitled to rely in part on the claimant's presentation at the hearing in assessing his or her subjective complaints. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). Indeed, credibility determinations by the ALJ are given deference because ALJs are in a special position to hear, see, and assess witnesses. *Id.* Regardless, and as the government notes, the ALJ explained how she concluded that Mitchel has only moderate concentrating, persisting, or pace limitations and her explanation encompassed far more than her observation that Mitchel could pay attention for more than 10 minutes at the hearing.

Mitchel does not point to any evidence in the record showing that the ALJ overlooked or glossed over the severity of his concentration issues, including those he alleges flow from his TBI. Instead, he reverts to the "chronic nature" of his injury and its sure-to-worsen symptoms which, according to Mitchel, will "cause far more than moderate limitation[s] in concentrating, persisting, or maintaining pace."

(R. 14, Pl.'s Mem. at 9.)  The court rejects this argument for the same reason it rejected Mitchel's step-two argument.  Namely, it offers nothing more than speculation as to how this condition could affect his future functioning.  Accordingly, Mitchel has not shown that this aspect of the ALJ's decision lacks the support of substantial evidence.

Mitchel also fails to point to evidence showing that the ALJ did not recognize the impact that his moderate limitations have on his ability to sustain full-time work.  Mitchel cites SSR 85-15 for the proposition that mentally impaired individuals have difficulty accommodating the demands of full-time work and work-like settings.  (See R. 14, Pl.'s Mem. at 10 (citing SSR 85-15p, 1985 WL 56857, at *5-6).)  This general proposition says nothing about Mitchel's ability to sustain full-time work during the relevant claim period.  Mitchel bears the burden of identifying the evidence that supports his claimed limitations.  And, once again, his argument that his ability to concentrate or remain on task for full-time work "will continue to get more seriously compromised" as time passes is speculative and unavailing.  In short, Mitchel has not shown that the ALJ failed to properly accommodate his non-exertional limitations.

## C.  Symptom Evaluation

Mitchel also asserts that the ALJ improperly evaluated his symptoms in several respects.  As previously noted, an ALJ's symptom evaluation is entitled to great deference because of the ability to observe first-hand the believability of the claimant's symptom descriptions.  *See Murphy*, 759 F.3d at 815.  As such, a

18

reviewing court may only reverse such a symptom assessment where it is "patently wrong." *Id*. at 816. The ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015). SSR 16-3p requires the ALJ to consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors in assessing the severity of the claimant's symptoms. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See Murphy*, 759 F.3d at 815.

Mitchel begins by taking issue with the ALJ's decision to discount his testimony regarding the numbness in his hands. According to Mitchel, the ALJ should have considered the fact that individuals in his age group typically "send far more than the three to ten text messages a day." (R. 14, Pl.'s Mem. at 11.) He argues that this is a "small example" of the ALJ's "preconceived—and misguided—notion about [his] capacity for truthfulness," suggesting that the entire symptom assessment is flawed. (Id.) The government counters that this is an "unfair characterization" of the ALJ's decision, (R. 18, Govt.'s Mem. at 5), and the court agrees. Contrary to Mitchel's assertion, the ALJ adequately explained how his treatment records undercut his subjective complaints and did not simply rely on the amount of texting he does each day. *See Murphy*, 759 F.3d at 816. And she correctly noted that there are no medical opinions in the record asserting that

Mitchel is unable to sustain full-time employment. (A.R. 21.) The court finds no error in the ALJ's acknowledgement of the same as part of her assessment.

On the whole, the ALJ reasonably compared Mitchel's testimony, including his complaints of hand numbness, to the objective medical evidence. Although Mitchel reported that numbness in his hands causes him to drop his phone, the ALJ noted that he later testified that he sends daily text messages. (Id. at 20.) The ALJ also pointed out that in numerous examinations physicians observed that Mitchel had normal grip strength in both hands. (Id. at 22-24.) Despite Mitchel's claim that the ALJ "cherry pick[ed]" certain evidence to support her conclusion, the ALJ acknowledged medical records documenting Mitchel's complaints of hand numbness. (Id. at 22-23.) She simply did not find that such records supported the severity Mitchel alleged. The court finds that the ALJ's explanation is reasonable and supported by substantial evidence.

Mitchel also takes issue with the ALJ's decision to reject his statements about his back pain and fatigue. Specifically, he argues that the ALJ disregarded his testimony regarding "limitations resulting from pain" solely because they were not substantiated by objective medical evidence, which is legally impermissible. (R. 14, Pl.'s Mem. at 13); *see Hall*, 778 F.3d at 691. It is true that the ALJ cited numerous objective medical records that undercut Mitchel's testimony that his "extreme back pain" makes it difficult for him to walk. (See, e.g., A.R. 21 (citing id. at 429 (Dr. Iacob noting normal gait on November 16, 2016), 433 (same on February 22, 2016), 711 (same on February 6, 2017), 746 (emergency room physician

20

reporting normal physical examination findings on June 7, 2017), 757 (physical therapy session documenting normal gait on March 18, 2016), 769 (same on April 18, 2016), 826 (same on May 16, 2016), 953 (same on July 18, 2016); see also id. at 23 (citing 733 (February 2017 spine MRI showing minimal degenerative changes)).) But the ALJ also noted the routine physical therapy Mitchel receives, which includes spinal manipulative therapy, inferential current therapy, moist heat packs, traction, and intersegmental traction therapy. (Id. at 21, 23.) Further, the ALJ observed that Mitchel's daily activities are not as limited as one would expect given his complaints. Specifically, with respect to his back pain the ALJ noted that he is able to travel three times a week, 45 minutes each way, to his chiropractor and drive 90 minutes to visit his parents most weekends despite complaints that he cannot sit in the same position for more than 20 minutes. (Id. at 21-22.) Thus, the ALJ relied on more than objective medical evidence to find Mitchel's alleged symptoms inconsistent with the evidence.

Similarly, despite Mitchel's claims of needing naps during the day because of fatigue, the ALJ reasonably found that there was no support for this level of fatigue in the record. (Id. at 22.) The ALJ noted Mitchel's testimony that his chiropractor recommended stretches for the fatigue and that his neurologist told him that naps are the best remedy. (Id. at 20.) She also noted that Mitchel uses a CPAP machine nightly as prescribed for his severe sleep apnea, (id.), and that in May 2016 he reported that his daily schedule involves attending doctor appointments, exercising, reading, watching TV, and doing household chores, (id. at 21). Further, the ALJ

observed that fatigue did not prevent him from taking a vacation to Boston, hanging out with his friends, or attending a concert at Soldier Field. (Id.) Again, the ALJ explained that the record generally reflects daily activities beyond what one would expect if Mitchel's fatigue were as severe as he claims. (See generally id.) Mitchel points to no evidence undermining the ALJ's evaluation of his statements. Accordingly, the court finds no error here.

Mitchel next argues that the ALJ should have explained how his reported activities equate to his ability to work full-time and that her failure to do so here violates Seventh Circuit precedent. (Id.) But as the government correctly notes, the ALJ permissibly pointed to Mitchel's activities as evidence contradicting his subjective complaints, not to equate those activities to full-time work. (R. 18, Govt.'s Mem. at 7); see Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) ("But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." (internal quotations omitted)). Mitchel has not shown that the ALJ's treatment of his daily activities renders her credibility assessment patently wrong.

Finally, Mitchel argues that the ALJ failed to properly consider the effects of his obesity pursuant to SSR 02-01p.[6] (R. 14, Pl.'s Mem. at 14.) Not only is Mitchel's argument on this issue perfunctory, but it is also without merit. The ALJ

---

[6] On May 20, 2019, the Social Security Administration rescinded SSR 02-1p and replaced it with SSR 19-2p. See SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). SSR 02-1p, however, was the applicable rule at the time the ALJ issued her decision in November 2017.

considered Mitchel's "morbid obesity," counting it among his severe impairments and explicitly considering how it combines with his other impairments. (See A.R. 16-17.) Contrary to Mitchel's assertion, in her RFC assessment the ALJ did more than "simply acknowledge" that Mitchel's obesity likely exacerbates his other impairments. (R. 14, Pl.'s Mem. at 14 (citing A.R. 24).) To account for his obesity, she incorporated several limitations described in SSR 02-1p into Mitchel's RFC, including limitations on balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (A.R. 24); *see* SSR 02-1p, 2002 WL 34686281, at *6 (explaining that obesity may "affect [the] ability to do postural functions, such as climbing, balancing, stopping, and crouching"). She also limited Mitchel to light exertional work based on the combination of his obesity, MS, and sleep apnea. (A.R. 25.) Notably, the ALJ assessed greater functional restrictions than the state agency reviewers. (Id. at 24.) All of this assures the court that the ALJ appropriately considered the effects of Mitchel's obesity. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding ALJ adequately accounted for claimant's obesity where the ALJ included it as a severe impairment, cited SSR 02-01p, and incorporated into the RFC "limitations on balancing, stooping, crouching, and climbing ramps and stairs").

Even assuming the ALJ's consideration of Mitchel's obesity was inadequate, Mitchel makes no attempt to explain what additional limitations should have been imposed because of his obesity. *See Shumaker v. Colvin*, 632 Fed. Appx. 861, 868 (7th Cir. 2015) (citing *Skarbek*, 390 F.3d at 504). As the government notes, Mitchel

merely asserts that he is "at great risk for developing obesity-related impairments" because of his BMI, which "hover[s] around the extreme obesity level." (R. 14, Pl.'s Mem. at 14.) Mitchel also asserts that the combined severity of his "musculoskeletal impairments" and obesity "would be far greater than the ALJ suggested." (Id.) Neither of these statements explains how his obesity affects his current functioning. *See Hernandez v. Astrue*, 277 Fed. Appx. 617, 624 (7th Cir. 2008) (finding the claimant "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do."); *see also* SSR 02-01p, 2002 WL 34686281, at *6 ("[W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments."). Thus, any error on the ALJ's part was harmless. *Shumaker*, 632 Fed. Appx. at 868; *Skarbek*, 390 F.3d at 504.

## D. Mental RFC Assessment

Mitchel's final set of arguments is undeveloped. He asserts that the ALJ "played doctor" and "revealed a misunderstanding of mental illness." (R. 14, Pl.'s Mem. at 14.) He fails to explain, however, what medical judgments the ALJ made or how she misunderstood his mental illness at any step of the sequential analysis. He merely alludes to the ALJ being "left primarily" with the opinions of the reviewing psychologists and offers no insight into its relevance. (Id.) This is the type of "perfunctory and undeveloped" argument that results in waiver. *See Hernandez*, 634 F.3d at 913; *see also Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704

(7th Cir. 2010) (explaining that it is not the court's "responsibility to research and construct the parties' arguments").

Waiver aside, Mitchel's argument still fails. Although not clearly stated, Mitchel appears to argue that the ALJ played doctor by failing to rely on any specific medical opinion when evaluating his mental RFC. But the determination of a claimant's RFC is a matter for the ALJ alone to decide. 20 C.F.R. § 404.1527(d) (the final responsibility for determining your RFC is reserved to the commissioner); *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). While "an ALJ must consider the entire record [in forming an RFC] . . . the ALJ is not required to rely entirely on any particular physician's opinion." *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citing *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995)). Nonetheless, to support the RFC assessment, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Here the court finds that the ALJ provided a sufficient narrative and supported her decision with substantial evidence. The ALJ considered the opinions of the reviewing state agency psychologists, but ultimately decided to assign them only "some weight" and, as already discussed, her reasoning on this point is sound. The ALJ also cited the opinions of the examining state agency psychologists, Drs. Gioia and Ingersoll, who diagnosed dysthymia and mild unspecified anxiety disorder, respectively. (A.R. 25-26.) Furthermore, the ALJ conducted an extensive review of records from Mitchel's treating sources, citing to medical evidence

concerning his mental impairments where appropriate. (See id. at 26 (noting Dr. Iacob's observation in February 2016 that Mitchel seemed hesitant when talking and had mild difficulty following his ideas).) She also noted nonmedical evidence, such as Mitchel's testimony that he is not currently seeing a counselor or psychiatrist for his depression. (Id. at 22.) Then, the ALJ assessed a mental RFC limiting Mitchel to simple routine tasks requiring no more than short simple instructions and simple work-related decision making with few workplace changes. (Id. at 26.) Therefore, the ALJ considered the entire record in formulating Mitchel's mental RFC—despite not relying entirely on any specific medical opinion—and did not, as Mitchel suggests, play doctor. *See Diaz*, 55 F.3d at 306 n.2 (rejecting claimant's assertion that the ALJ played doctor because she did not rely solely on the opinions of physicians in assessing his RFC and instead turned to other medical evidence and testimony).

In another undeveloped argument, Mitchel contends that the ALJ violated her duty to develop the record. (R. 14, Pl.'s Mem. at 14.) According to Mitchel, the ALJ should have "sought further clarification" regarding his depression, even though the ALJ labeled it a severe impairment.[7] (Id.) Generally, the ALJ's duty to obtain additional evidence is triggered only if the record is insufficient to support

---

[7] Mitchel criticizes the ALJ for noting "that there was little medical evidence in the record" concerning his depression. (See R. 14, Pl.'s Mem. at 14.) Mitchel misconstrues the ALJ's reasoning. The ALJ noted Mitchel's testimony that he is not currently seeing a counselor or psychiatrist for his depression to support the predominance in the record of Mitchel's own subjective complaints, (see A.R. 21-22), not as an acknowledgment that there is insufficient medical evidence in the record concerning his depression, as Mitchel suggests.

her decision. 202 C.F.R. § 404.1520b(b). Further, the ALJ's determination of whether the record before her was adequately developed is entitled to deference. *See Wilcox v. Astrue*, 492 Fed. Appx. 674, 678 (7th Cir. 2012); *accord Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) ("[I]t is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment."). Here Mitchel has not met his burden of specifying what additional evidence or examinations would have contributed to the ALJ's assessment of his depression. *See Wilcox*, 492 Fed. Appx. at 678 ("Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence indicating that further development is required."). Furthermore, the only case Mitchel cites in support of this argument is *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009), which stands for the proposition that the ALJ has a heightened duty to develop the record when a claimant appears *pro se*. Mitchel was represented by counsel here. (A.R. 39-86.) *Nelms*, therefore, is inapplicable to the facts and circumstances of this case.

In any event, and contrary to Mitchel's assertion, in reviewing the evidence before the ALJ and according her decision the requisite deference, the court determines that she had sufficient evidence to make a decision regarding his depression. For instance, Mitchel reported to Dr. Iacob in August 2015 that a previous medication for his TBI caused him the side effect of depression. (Id. at 427.) Then in December 2015, Mitchel reported to Dr. Gioia that his doctors were concerned about his anxiety level. (Id. at 460.) At that time, Dr. Gioia noted that

Mitchel's overall mood appeared to be depressed and dysthymic. (Id. at 461.) Later in May 2016 Dr. Ingersoll assessed mild unspecified anxiety disorder. (Id. at 472.) And, as discussed above, the ALJ relied on this and other record evidence and testimony in evaluating the limitations resulting from Mitchel's depression, assessing a mental RFC that is more restrictive than any reviewing psychologist assigned. Thus, the court finds that the ALJ reasonably determined that there was sufficient evidence in the record to assess Mitchel's mental RFC.

Finally, Mitchel argues that the ALJ erred in evaluating his mother's testimony. (R. 14, Pl.'s Mem. at 15.) Mitchel claims that the ALJ erred in assigning "minimal weight" to his mother's testimony because she is not considered to be a medical source. (Id.) The court disagrees. The ALJ specifically stated that she assigned only minimal weight to his mother's testimony because the medical evidence does not support her testimony as to the nature and extent of Mitchel's symptoms and limitations. (A.R. 25.) Assigning lesser weight to the testimony of a lay witness because of inconsistencies with the record is entirely permissible. *See Arnold v. Barnhart*, 473 F.3d 816, 821-22 (7th Cir. 2007). Furthermore, even if the ALJ had erred, any such error would be harmless because the mother's testimony corroborated Mitchel's own testimony. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (reiterating that an ALJ need not address a lay witness's testimony when it is "essentially redundant" of testimony already in the record). Accordingly, Mitchel has not shown that a remand is warranted based on the ALJ's decision to assign minimal weight to his mother's testimony.

## Conclusion

For the foregoing reasons, Mitchel's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**